UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RAJEEV MUNJAL,

                                    Plaintiff,

                    -v-

EMIRATES,

                                    Defendant.

---

21 Civ. 8401 (PAE)

OPINION &
ORDER

PAUL A. ENGELMAYER, District Judge:

This case involves employment discrimination claims brought under state and city law by Rajeev Munjal, a New Jersey resident, against Emirates, an airline based in Dubai. Munjal worked for Emirates as a finance manager between 2012 and April 2021, when he resigned. He brings race and disability discrimination claims against Emirates under the New York State Human Rights Law, New York Exec. Law § 290 *et seq.* ("NYSHRL"), New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq.* ("NYCHRL"), and the New York Equal Pay Act, New York Labor Law § 194.

Pending now is Emirates' motion to dismiss certain claims as untimely under Federal Rule of Civil Procedure 12(b)(6).[1] For the following reasons, the Court grants the unopposed motion to dismiss the NYSHRL claims, but denies the motion to dismiss the NYCHRL claims.

---

[1] Emirates also moved to strike the jury trial demand from Munjal's complaint under Federal Rule of Civil Procedure 39(a)(2). Dkt. 7 ("Def. Mem.") at 7–9. That motion is moot, as Munjal now agrees that the case will not be tried to a jury. *See* Dkt. 18 ¶ 2; Dkt. 23 ("Pl. Opp'n") at 10.

## I.    Background

### A.    Factual Background[2]

#### 1.    The Parties

Munjal is an Indian national who lives in New Jersey.  AC ¶¶ 1, 4.  In October 2016, he suffered a "massive heart attack."  *Id.* ¶ 11.  Emirates is a foreign business corporation.  *Id.* ¶ 2. It is based in Dubai, United Arab Emirates ("UAE").  *Id.* ¶ 5.

#### 2.    Munjal's Early Career with Emirates in Dubai (2012–2014)

In September 2012, Munjal joined Emirates in Dubai as a Manager, Finance Outstations ("MFO").  *Id.* ¶ 4.  He was paid at a Grade 10 level.  *Id.*  He was managed by Raj Bhavnani, an Indian national, the VP of Finance and Risk Management; Bhavnani reported to Michael Doersam, SVP Group Finance.  *Id.* ¶¶ 4, 5.

In October 2013, Bhavnani was terminated and replaced by Hanno Kroemer, a Dutch national.  *Id.* ¶¶ 5, 6.  At the time, Indian nationals held "almost all" the senior management positions in the Finance and Risk Management group, whose leadership Kroemer assumed, consistent with the fact that "[t]here is a large expatriate community of Indian nationals in professional positions in the UAE."  *Id.* ¶ 5.  Kroemer "immediately made disparaging remarks indicating his discomfort" with working with so many Indian nationals; he "began systematically eliminating them from the senior management positions reporting to him."  *Id.* ¶ 6.[3]  The first time Kroemer met with Munjal and his direct reports—all of whom were of Indian national

---

[2] These facts are drawn from the Amended Complaint.  *See* Dkt. 15 ("AC").  For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of the plaintiff.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

[3] For example, although four of Kroemer's original five Grade 10 managers were Indian nationals, he "replaced all four . . . with European nationals and ultimately had only one Indian senior manager reporting to him" by the time he left the position in March 2020.  AC ¶ 6.

origin—Kroemer said, "I thought I was at Emirates but it looks like Air India." *Id.* ¶ 12. Munjal and his team "were shocked at the overt and undisguised prejudice" this comment evinced. *Id.* Kroemer "repeatedly made disparaging comments to his direct reports about how many Indians were employed" by Emirates' accounting department. *Id.*

### 3.    Munjal's Move to New York City (2015)

Among those supervised by Kroemer were 12 Regional and Finance Managers ("RFAMs") located abroad.  At the time, the Americas RFAM, Bhupinder Nanda, was an Indian national based in New York City. *Id.* ¶ 7.  In December 2015, Munjal transferred from Dubai to New York City to fill the Regional Accounting Manager ("RAM") position, a Grade 9 position, which reported to Nanda. *Id.* ¶ 8.  Munjal had "wanted to relocate to the United States for family reasons." *Id.*

### 4.    Munjal's First Tenure as Acting RFAM (April 2017–April 2018)

In April 2017, Kroemer fired Nanda. *Id.* ¶ 9.  At that point, and for several years thereafter, Kroemer "repeatedly assign[ed] . . . Munjal to perform the RFAM position on an acting basis," but "repeatedly refused to appoint . . . Munjal permanently . . . or pay him the compensation others were paid for the role." *Id.* (emphasis omitted).  The AC alleges that "Kroemer's refusal to do so was because of . . . prejudice," based on Munjal's Indian national origin. *Id.*  This occurred even though the U.S. Country Manager, Matthias Schmid, with whom the RFAM works closely, "repeatedly told" Munjal that "he believed [Munjal] was the right person to fill the RFAM role permanently" and believed he would be given the permanent role. *Id.* ¶ 15.

In April 2017, Kroemer appointed Munjal acting RFAM, but Munjal had to continue his RAM duties. *Id.* ¶ 14.  Thus, Kroemer had "essentially giv[en] him two jobs on an interim basis." *Id.*  Kroemer did not give Munjal additional compensation. *Id.*

3

At some time thereafter, Munjal formally applied for the RFAM position via an internal posting. *Id.* ¶ 16. On July 31, 2017, Munjal interviewed for the role with Kroemer, Schmid, and Wasan Al Husseiny, Emirates' U.S. Human Resources Manager. *Id.* Ultimately, the decision about the role was Kroemer's. *Id.* On August 3, 2017, Schmid told Munjal that "he continued to believe [Munjal] was the right person for the job," but that "it was clear to [Schmid] that Kroemer was not going to give [Munjal] the position" because of "Kroemer's prejudice against him because he was Indian." *Id.* ¶ 17.

In the months that followed, Munjal continued as acting RFAM. At some point between July and December 2017, Doersam, Munjal's ultimate supervisor, said to Munjal when he was visiting Dubai, "you can't even take care of your health so how can we give you the RFAM role?" *Id.* ¶ 32. Munjal took this to be a reference to a severe heart attack Munjal had suffered in October 2016, which he viewed as a turning point in his relationship with Doersam, who was dismayed that Munjal was not "looking after" his health. *Id.*

On December 1, 2017, Munjal emailed Kroemer, asking Kroemer to reconsider his application to be RFAM. Munjal described his accomplishments and identified people from whom Kroemer could obtain feedback about Munjal. *Id.* ¶ 18. Kroemer responded that he would "gather the feedback from the various stakeholders" and meet with Munjal on his next visit to the United States in mid-January. *Id.* On January 15 and 16, 2018, Kroemer visited New York, but he did not meet with Munjal, and spoke to him only when he was about to leave for the airport. *Id.* ¶ 19. At that point, he told Munjal, "without any explanation," that he was not going to offer him the permanent RFAM position. *Id.* When Munjal discussed this setback with Schmid, Schmid "reiterated that Kroemer's refusal to promote him had nothing to do with his

performance or the objective merits of his candidacy" and expressed frustration at Kroemer's decision. *Id.*

In March 2018, Munjal was recognized for his hard work as RAM and acting RFAM. *Id.* ¶ 20.

### 5.     Dekempe's Tenure as RFAM (April 2018–February 2019)

In April 2018, Kroemer hired Jan Dekempe as permanent RFAM, paid at a Grade 10 scale of $260,000 annually. *Id.* ¶ 21. When Munjal was acting RFAM, he had been paid at a Grade 9 scale of $144,000 annually. *Id.*

Munjal continued as RAM and reported to Dekempe and Schmid. On October 15, 2018, Dekempe and Schmid rated Munjal's performance as "Very Good" in a formal performance review. *Id.* ¶ 22. The review's comments section, written by Schmid, observed that Munjal "stepped up in a big way as ad-interim [RFAM] and managed the dual-job situation in a very good and professional way." *Id.* The comments also noted that Munjal's non-promotion to RFAM "was not an easy situation" for Munjal, but that he had handled it professionally. *Id.*

In February 2019, Dekempe was fired, "after a group security investigation revealed inappropriate expense claims." *Id.* ¶ 23. Even before then, members of senior management "had . . . repeatedly made clear that they were unhappy with Dekempe's performance," and Munjal personally saw Dekempe struggling in the role. *Id.* "Dekempe [had] repeatedly told Mr. Munjal in private that he did not understand why Kroemer had not given Mr. Munjal the job." *Id.*

### 6.     Munjal's Second Tenure as Acting RFAM (February 2019–November 2019)

Munjal again assumed the role of acting RFAM, alongside his permanent RAM position, after Dekempe was fired. Again, he was not paid additional compensation. *Id.* ¶ 24.

In March 2019, Munjal again formally applied to be permanent RFAM. On April 4, 2019, he was interviewed by Kroemer, Al Husseiny, and Richard Jewsbury, the acting U.S. country head. *Id.* ¶ 25. As Schmid had earlier, Jewsbury "indicated in direct discussions with Mr. Munjal that he strongly supported giving him the role" but that the final decision remained Kroemer's. *Id.*

At some time after the interview, Kroemer told Munjal he would not be promoted to permanent RFAM because he had not discussed "Finance Organization issues" during his interview. *Id.* ¶ 26. The AC alleges that this was a "transparent pretext" for discrimination, as Munjal and Kroemer had discussed these issues the day before, for four hours, "in extensive detail." *Id.*

In September 2019, Munjal, in a meeting with Doersam, stated that he had hoped to attain the permanent RFAM role. *Id.* ¶ 32. Doersam responded "by [referring to] Munjal's health as being a concern." *Id.* This comment, and the similar comment made in 2017, were among several by Doersam that Munjal's colleagues reported to him. Those comments "indicated that [Doersam] was reluctant to give Mr. Munjal the permanent RFAM position because of [Munjal's] health." *Id.* ¶ 33.

### 7. Mahowe's Tenure as Acting RFAM (November 2019–July 2020)

On November 1, 2019, Kroemer announced that Munjal would be replaced as acting RFAM by Lloyd Mahowe, RFAM for the Middle East. *Id.* ¶ 27. Kroemer further stated that "he was continuing to search for a permanent RFAM replacement" and that Mahowe would spend two weeks per month in the United States as part of his acting position. *Id.* But, the AC alleges, Mahowe came to the United States only twice over the next eight months and Munjal, in

practice, "continued to perform most of the functions of the RFAM position . . . without even being given the 'acting' title." *Id.*[4]

On November 8, 2019, Jewsbury gave Munjal a formal performance review and again rated him "Very Good." *Id.* ¶ 28. Jewsbury's comments included that Munjal's work as RAM and acting RFAM "kept the Americas operation going during a very difficult and volatile time" despite "several ongoing issues," because Munjal "stepped up and took on additional responsibility," and described Munjal's department as experiencing "a very difficult working environment." *Id.*

### 8.    Munjal's Appointment as Permanent RFAM (July 2020–April 2021)

On March 15, 2020, Brenda Rademayer took over Kroemer's position as head of the Finance and Risk Management group. The AC alleges that it was "apparent she did not share Kroemer's prejudice against Indian nationals because," on July 2, 2020, Munjal was promoted to permanent RFAM. *Id.* ¶ 29. But Munjal "was not given an increase in grade or an increase in salary" and continued to be paid his RAM salary. *Id.* Whereas Dekempe, the only person to have served as permanent RFAM during the preceding three years, had been paid $260,000 annually, Munjal was paid $144,000 annually. Munjal's pay also did not reflect that the Americas was a high-revenue region for Emirates and that "the RFAMs serving other high-revenue regions within the Emirates organization were all assigned a [G]rade 10" salary. *Id.* ¶¶ 21, 29. The AC attributes this disparity to discrimination by Doersam, who "continued to resist approving a promotion to Grade 10" and giving Munjal a comparable salary to his predecessors "because of his concerns about [Munjal's] serious medical condition." *Id.* ¶ 11.

---

[4] These duties included "compliance, business support, credit risk management and bank, invoice and expense approvals." AC ¶ 27. Munjal "also continued to fulfill the RFAM responsibility of being the sole 401k plan management trustee beginning in April 2017 and continuing until his departure." *Id.*

Beginning in November 2020, Munjal met with Essa Sulaiman Ahmad—who had replaced Jewsbury as Emirates Divisional Vice President—several times "to address the inappropriate grade and compensation" in his role. *Id.* ¶ 30. Ahmad agreed with Munjal, and "assured him he was working on correcting the problem," but cautioned that Doersam had to approve the decision. *Id.*

On February 5, 2021, Munjal met with Ahmad and Al Husseiny and told them he would leave Emirates if he were not paid more. Ahmad "indicated he was still working on it with Doersam" and asked Munjal to delay his potential departure. *Id.*

Ahmad eventually told Munjal that he had gotten approval from Doersam to promote Munjal to Grade 10, effective April 1, 2021. But by then, Munjal had found another job and wanted to leave Emirates, because of the discrimination he had experienced. *Id.* ¶ 31. On April 16, 2021, Munjal resigned from Emirates. *Id.*

### B.    Procedural History

On September 10, 2021, Munjal filed his original complaint in New York State Supreme Court in Manhattan. *See* Dkt. 1, Ex. 1. On October 12, 2021, Emirates timely filed a notice of removal under 28 U.S.C. § 1441(d), which applied because Emirates is wholly owned by the Government of Dubai and thus qualifies statutorily as a "foreign state." Dkt. 1 ¶¶ 7–8; AC ¶ 3.[5]

On October 19, 2021, Emirates filed the instant partial motion to dismiss and motion to strike the jury demand, Dkt. 6, and the accompanying memorandum of law, Dkt. 7 ("Def.

---

[5] Removal to federal court is common by airlines that, by dint of ownership, are agencies or instrumentalities of a foreign state. *See, e.g.*, *Dutta v. Emirates*, 21 Civ. 1242, 2022 WL 60347, at *2 (N.D. Tex. Jan. 6, 2022); *Chowdhury v. Saudi Arabian Airlines*, No. 13 Civ. 2537, 2013 WL 2395986, at *2 (E.D.N.Y. May 31, 2013) (Saudi Arabian Airlines an agency or instrumentality of foreign state); *Bazzy v. Royal Jordanian Airlines*, No. 92 Civ. 1391, 1992 WL 106381, at *1 (E.D.N.Y. May 7, 1992) (noting that there was "no suggestion that removal" on the ground of Royal Jordanian Airlines being an agency or instrumentality of a foreign state was improper) (collecting cases).

Mem."), and the affirmation of John J. Porta, Esq., in support, Dkt. 8. The same day, Emirates also filed an answer. Dkt. 10. On October 20, 2021, the Court ordered Munjal to file an amended complaint or otherwise oppose the motion to dismiss. Dkt. 12.

On November 8, 2021, Munjal filed the amended complaint. Dkt. 15 ("AC"). It brings claims against Emirates for race and disability discrimination under the NYSHRL, NYCHRL, and the New York Equal Pay Act. On November 17, 2021, the Court held an initial pretrial conference and issued a civil case management plan. *See* Dkts. 14, 18. On November 30, 2021, Emirates informed the Court that it intended to rely on its previously filed motion to dismiss. Dkt. 20. On December 20, 2021, Munjal filed an opposition to the partial motion to dismiss. Dkt. 23 ("Pl. Opp'n"). On January 5, 2022, Emirates filed a reply. Dkt. 24 ("Reply").

## II.    Applicable Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). By contrast, a complaint will not "suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks and alterations omitted). Such factual enhancement is necessary to "nudge[] [a] claim[] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Although this standard "does not impose a probability requirement at the pleading stage," it does require a complaint to plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support plaintiff's claims. *Id.* at 556. Where a complaint fails to do so, "this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the [C]ourt." *Id.* at 558 (ellipsis omitted) (quoting 5 Wright &

9

Miller, Federal Practice and Procedure § 1216). Otherwise, "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching those proceedings." *Id.* at 559.

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the [Court] to draw on its judicial experience and common sense. But where the well-pled facts do not permit inferring more than the mere possibility of misconduct, the complaint has not shown an entitlement to relief and must be dismissed." *Iqbal*, 556 U.S. at 679 (cleaned up). Although the Court must accept as true all well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

## III.    Discussion

Emirates moves to dismiss all NYSHRL and NYCHRL claims arising from conduct that occurred three years or more before Munjal filed his complaint in state court—that is, all claims arising out of conduct before July 1, 2018. Munjal appears to concede that dismissal is required of such claims under the NYSHRL. But he argues that conduct before that date—in particular, Kroemer's series of decisions not to promote Munjal—is timely alleged under the NYCHRL pursuant to the continuing violation doctrine. He separately notes that, in any case, evidence of such conduct could be received as background evidence relevant to his timely claims. The Court addresses Emirates' challenge to the NYSHRL claims first and then that to the NYCHRL claims.

### A.    Applicable Law

Claims under the NYSHRL and NYCHRL are subject to a three-year statute of limitations. N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8-502(d); *see Canosa v. Ziff*, No. 18 Civ. 4115 (PAE), 2019 WL 498865, at *18 (S.D.N.Y. Jan. 28, 2019). Under each statute, the

10

continuing violation doctrine supplies an exception to that time bar, but that doctrine is not applied identically under the two statutes.

The NYSHRL tracks Title VII of the Civil Rights Act of 1964 as to the scope of the continuing violation doctrine. Under Title VII, "[w]hen a plaintiff experiences a continuous practice and policy of discrimination . . . the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994) (cleaned up). In *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ("*Morgan*"), the Supreme Court construed that doctrine under Title VII to "preclude[] recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period," *id.* at 105. Justice Ginsburg explained the rationale for not treating such acts as timely:

> A worker knows immediately if she is denied a promotion or transfer, if she is fired or refused employment. And promotions, transfers, hirings, and firings are generally public events, known to co-workers. When an employer makes a decision of such open and definitive character, an employee can immediately seek out an explanation and evaluate it for pretext.

*Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 649 (2007) (Ginsburg, J., dissenting). Courts applying the continuing violation doctrine under the NYSHRL since *Morgan* have followed suit. *See, e.g.*, *Taylor v. City of New York*, 207 F. Supp. 3d 293, 302 (S.D.N.Y. 2016) (citing *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 250 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013)); *id.* 302 n.5 ("[T]he weight of authority has held that *Morgan* applies to the NYSHRL.").

By contrast, "New York courts have held that the pre-*Morgan*, more generous continuing violations doctrine continues to apply to discrete acts of employment discrimination under [the] NYCHRL." *Dimitracopoulos v. City of New York*, 26 F. Supp. 3d 200, 212 (E.D.N.Y. 2014) (citing *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 35 (1st Dep't 2009)); *see also, e.g.*,

*Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (describing NYCHRL's independently liberal construction and "one-way ratchet," under which federal and state civil rights laws create a "floor below which the [NYCHRL] cannot fall") (cleaned up).  Accordingly, under the NYCHRL, "[o]therwise time-barred discrete acts [are considered] timely 'where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.'"  *Taylor*, 207 F. Supp. 3d at 302–03 (first alteration in original) (quoting *Dimitracopoulos*, 26 F. Supp. 3d at 212 (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001)).

### B.    Application to Pre-July 1, 2018 Conduct Under the NYSHRL

Emirates argues that Munjal's claims under the NYSHRL are untimely to the extent that they are based on conduct occurring more than three years before he filed the complaint.  Def. Mem. at 5; Reply at 2–3.  Munjal does not resist this argument.  *See generally* Pl. Opp'n.  On the contrary, his memorandum in opposition to the partial motion to dismiss repeatedly distinguishes between the NYSHRL's and the NYCHRL's approaches to the continuing violation doctrine. *See, e.g., id.* at 5 ("the continuing violation doctrine is given a broader construction under the NYCHRL than under . . . the NYSHRL") (quoting *Cardwell v. Davis Polk & Wardwell LLP*, 19 Civ. 10256 (GHW), 2020 WL 6274826, at *39 (S.D.N.Y. Oct. 24, 2020)), 7 ("*Morgan* is highly instructive concerning the difference in the scope of the continuing violation doctrine under the NYCHRL, on the one hand, and the NYSHRL and Title VII on the other.").  The Court therefore treats Munjal as having abandoned such claims.  *See Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("[A] court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.").

Emirates goes further—and urges the Court to bar evidence of pre-July 1, 2018 conduct as background evidence in support of Munjal's timely claims.  Reply at 9–10.  That argument

fails. As the Supreme Court has explained, the Title VII time bar for discrete acts does not "bar an employee from using the prior [discrete] acts as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113; *see also Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176–77 (2d Cir. 2005) ("[R]elevant background evidence . . . may be considered to assess liability on the timely alleged act."). The same is so under the NYSHRL. *See, e.g., Kellman v. Metro. Transp. Auth.*, 8 F. Supp. 3d 351, 370 (S.D.N.Y. 2014) (citing *Anderson v. Nassau Cnty. Dep't of Corr.*, 558 F. Supp. 2d 283, 299 (E.D.N.Y. 2008)); *St. Jean Jeudy v. City of New York*, 37 N.Y.S.3d 498, 500 (1st Dep't 2016). The issue of the admissibility of such evidence is instead assessed under the Federal Rules of Evidence. It is premature, at this early stage, to assess the extent to which such evidence will be properly received. The Court will make that determination, to the extent necessary, close to or at trial, should the case proceed that far.

Emirates relatedly argues that because, in its view, the AC does not allege any adverse employment action occurring before July 1, 2018, evidence of conduct before that date will be categorically off-limits as background evidence at trial. Reply at 10. That is wrong for multiple reasons. First, there is no requirement that, to be considered at trial, evidence of conduct outside the limitations period describe an adverse employment action.[6] Instead, the Second Circuit has held, "relevant background evidence" may include, among other things, "statements by a

---

[6] In so arguing, Emirates relies on a strained reading of an inapposite footnote in a Second Circuit decision. *See* Reply at 9–10 (citing *Jute*, 420 F.3d at 178 n.8 and *Ikejiaku v. Rochester City Sch. Dist.*, No. 07 Civ. 6191, 2011 WL 1099131, at *6 (W.D.N.Y. Mar. 22, 2011), which cites the footnote in *Jute*). The *Jute* footnote, however, did not set rules for the admissibility of background evidence. Instead, it explained why an allegedly retaliatory refusal to authorize travel did not qualify as an adverse employment action and why the plaintiff therefore had failed to state a *prima facie* case of retaliation.

decisionmaker," and evidence of "earlier decisions typifying the [conduct alleged] involved." *Jute*, 420 F.3d at 176–77.

Second, Emirates' premise is wrong that no pre-July 1, 2018 conduct pled qualifies as an adverse employment action. A failure to promote, which the AC alleges occurred repeatedly during that period, may so qualify.[7] *See, e.g.*, *Terry v. Ashcroft*, 336 F.3d 128, 139 (2d Cir. 2003); *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002). That is so even though Munjal eventually was promoted to the position. The caselaw "reflects divergent outcomes . . . where a promotion has been obtained but only after a delay allegedly driven by discrimination." *Fitchett v. City of New York*, No. 18 Civ. 8144 (PAE), 2019 WL 3430726, at *10 (S.D.N.Y. July 30, 2019) (collecting cases). But here, where Munjal's promotion came, as alleged, three years after the start of the discriminatory refusals to promote him, he has met the burden to plead a *prima facie* case of discrimination. *See id.* (where "promotion might be deemed more than three and a half years late[, t]he facts pled adequately plead an adverse employment action").

The Court accordingly grants Emirates' unopposed motion to dismiss the untimely claims under the NYSHRL. However, evidence of defendants' conduct towards Munjal before July 1, 2018 may be admissible at trial, subject to the Federal Rules of Evidence.

### C.    Application to Pre-July 1, 2018 Conduct Under the NYCHRL

Under the NYCHRL's more generous continuing violation standard, Munjal may pursue relief for his pre-July 1, 2018 claims, because, as alleged, the repeated failures to promote during this period were discrete acts that were part of a discriminatory policy or practice that reached into the limitations period.

---

[7] *Ikejiaku, supra*, which Emirates cites in support of its errant reading of *Jute*, itself recognizes this. *See id.*, 2011 WL 1099131, at *6 ("denial of a promotion may be considered an adverse employment action").

First, the AC alleges discrete acts of discrimination before July 1, 2018. These include (1) in April 2017, Kroemer's denial to Munjal of compensation commensurate with that of his peers at the time he was appointed acting RFAM; (2) after Munjal applied and interviewed for the permanent RFAM role on July 31, 2017, Kroemer's rejection of his candidacy; (3) on December 1, 2017, Kroemer's refusal to reconsider Munjal's candidacy; and (4) in April 2018, Kroemer's failure to promote Munjal and his hiring of Dekempe instead. Second, the AC alleges that these acts were part of a discriminatory policy or practice that extended into the limitations period. The AC alleges at least three such discriminatory acts during that period: (1) in February 2019, Kroemer refused to promote Munjal to the permanent RFAM position after Dekempe's departure, or pay him any additional compensation for acting in this role; (2) after Munjal's April 4, 2019, interview, Kroemer again rejected Munjal's application; and (3) on November 1, 2019, Kroemer removed Munjal from the acting RFAM position.

Emirates only weakly contests that these acts are well-pled as discriminatory. *See* Def. Mem. at 6–7; Reply at 5 (claiming that AC fails to allege specific instances of discrimination because it does not "reference a specific testing procedure implemented to select candidates" or evaluate in detail Munjal's competitors). Instead, it largely casts these individual acts as unconnected: "Each of these events," it argues, is "a discrete act independent in time and circumstance from one another and from any of Plaintiff's timely pleadings." Reply at 6. Emirates therefore claims that—whether under the *Morgan* standard that is inapplicable to the NYCHRL or the more generous governing standard—the AC does not state a continuing violation.

As a basis for dismissal, however, Emirates' argument fails. Insofar as Emirates argues that to be established, the AC's challenges to each individual failure to promote or compensate

15

"require a review of comparators as well as review of [Munjal]'s individual performance at the time the decisions were made," *id.*, no such showing is required at the pleading stage. Courts in this Circuit instead typically employ Title VII's failure-to-promote framework to analyze NYCHRL failure-to-promote claims, "[w]hile bearing in mind the more liberal standards of the NYCHRL." *Campbell v. Cellco P'ship*, 860 F. Supp. 2d 284, 297 (S.D.N.Y. 2012); *Anderson v. New York City Health & Hosps. Corp.*, No. 16 Civ. 1051 (GBD) (KHP), 2020 WL 2866960, at *13 (S.D.N.Y. Mar. 2, 2020), *report and recommendation adopted*, No. 16 Civ. 1051 (GBD) (KHP), 2020 WL 1528101 (S.D.N.Y. Mar. 31, 2020); *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 679 (S.D.N.Y. 2012). Under that framework, the AC need allege only that Munjal is a member of a protected class; that his job performance was satisfactory; that he applied for and was denied promotion to a position for which he was qualified; and that the position remained open and the employer continued to seek applicants. *See Campbell*, 860 F. Supp. 2d at 297. And "[u]nder governing Second Circuit precedent . . . when a plaintiff applies for and is denied a position, the fact that the position was filled by someone outside the plaintiff's protected class is itself enough to give rise to [an inference of discrimination]." *Feliciano v. City of New York*, No. 14 Civ. 6751 (PAE), 2015 WL 4393163, at *4 (S.D.N.Y. July 15, 2015) (collecting cases). The AC undisputedly pleads these elements. The qualifications of Munjal's potential comparators, and an assessment of Munjal's work and qualifications, are subjects for discovery—and potentially summary judgment and trial—but are not a basis for dismissal of his well-pled claims under the NYCHRL.

Emirates relies on several district court cases that hold that the standard for claims of a continuing violation under the NYCHRL is that which the Supreme Court announced in *Morgan*

for claims under Title VII.[8]  As noted, however, lower courts in New York State, after *Morgan*, have continued to apply the broader continuing violation standard to NYCHRL claims.  *See* § 3.A, *supra*.  These include the Appellate Division, First Department, which in its 2009 decision in *Williams*, explained:

> In [*Morgan*], the Supreme Court established that for federal law purposes, the "continuing violation" doctrine only applied to harassment claims as opposed to claims alleging "discrete" discriminatory acts.  At the time the comprehensive 1991 amendments to the [NYCHRL] were enacted, however, federal law in the Second Circuit did not so limit continuing violation claims.  There is no reason to believe that the Supreme Court's more restrictive rule of 2002 was anticipated when the [NYCHRL] was amended in 1991, or even three years after that ruling, when the Restoration Act was passed in 2005.  On the contrary, the Restoration Act's uniquely remedial provisions are consistent with a rule that neither penalizes workers who hesitate to bring an action at the first sign of what they suspect could be discriminatory trouble, nor rewards covered entities that discriminate by insulating them from challenges to their unlawful conduct that continues into the limitations period.

872 N.Y.S.2d at 35 (internal citations omitted).  In 2020, the Appellate Division reiterated this conclusion, stating that "the reach of the continuous violation doctrine under [the] NYCHRL is broader than either federal or state law."  *Ctr. for Indep. of Disabled v. Metro. Transp. Auth.*, 125 N.Y.S.3d 697, 703 (1st Dep't 2020); *see also St. Jean Jeudy*, 37 N.Y.S.3d at 500.  Pending a definitive resolution of this issue from the New York Court of Appeals or the Second Circuit, this Court follows these state-court authorities—as have various courts in this District.[9]

---

[8] *See Doe v. Anonymous, Inc.*, No. 18 Civ. 10924 (PAC), 2019 WL 2616904, at *4 (S.D.N.Y. June 25, 2019), *aff'd*, 794 F. App'x 129 (2d Cir. 2020) (summary order); *Colon v. City of New York*, No. 19 Civ. 10435 (PGG) (SLC), 2021 WL 4943552, at *11 (S.D.N.Y. Jan. 15, 2021), *report and recommendation adopted*, No. 19 Civ. 10435 (PGG) (SLC), 2021 WL 4427169 (S.D.N.Y. Sept. 26, 2021); *see also Bermudez v. City of New York*, 783 F. Supp. 2d 560, 574 (S.D.N.Y. 2011).

[9] *See, e.g.*, *Richardson v. City of New York*, No. 17 Civ. 9447 (JPO), 2018 WL 4682224, at *12 (S.D.N.Y. Sept. 28, 2018); *id.* at *12 n.12 (noting that courts are divided on this question but that the parties there assumed that the NYCHRL is subject to a more generous standard); *Rogers v. Fashion Inst. of Tech.*, No. 14 Civ. 6420 (AJN), 2017 WL 1078572, at *10 (S.D.N.Y. Mar. 21,

Finally, to the extent that Emirates cites cases in support of its argument that the serial failures to promote Munjal are not adequately alleged to form a pattern of continuing violations, these cases are easily distinguished. In *Doe v. Anonymous Inc.*, the court declined to apply the continuing violation doctrine where the plaintiff "d[id] not sufficiently allege discrimination within the limitations period." 2019 WL 2616904, at *4. In affirming that aspect of the holding, the Second Circuit noted that Doe could not "avoid the NYCHRL's time-bar by invoking the continuing violation doctrine," because "[f]or that doctrine to apply, a plaintiff must allege some act of discrimination or harassment that occurred during the applicable limitations period." *Doe v. Anonymous Inc.*, 794 F. App'x at 130 (citing *Williams*, 872 N.Y.S.2d 27). The AC here does so. It alleges discriminatory acts during the applicable limitations period—indeed, acts of the same character as those outside of it. Emirates also cites *Grimes-Jenkins v. Consol. Edison Co. of New York, Inc.*, but there, the court emphasized that the time-barred allegations "concern a wide variety of discriminatory conduct carried out by a number of individuals." No. 16 Civ. 4897 (AT) (JCF), 2017 WL 2258374, at *9 (S.D.N.Y. May 22, 2017), *report and recommendation adopted*, No. 16 Civ. 4897 (AT) (JCF), 2017 WL 2709747 (S.D.N.Y. June 22, 2017). Here, in contrast, the "timely and untimely allegations" are connected "in [a] meaningful

_____

2017); *Taylor*, 207 F. Supp. 3d at 302–03; *Dimitracopoulos*, 26 F. Supp. 3d at 212; *Sotomayor*, 862 F. Supp. 2d at 250–51. This includes cases marshaled by Emirates in support of their motion. *See Cruz v. City of New York*, No. 21 Civ. 1999 (DLC), 2021 WL 5605139, at *5 (S.D.N.Y. Nov. 30, 2021) ("The reach of the continuous violation doctrine under the NYCHRL, however, is broader than under either federal or state law.") (cleaned up); *Grimes-Jenkins v. Consol. Edison Co. of New York, Inc.*, No. 16 Civ. 4897 (AT) (JCF), 2017 WL 2258374, at *9 (S.D.N.Y. May 22, 2017), *report and recommendation adopted*, No. 16 Civ. 4897 (AT) (JCF), 2017 WL 2709747 (S.D.N.Y. June 22, 2017) (describing "the NYCHRL's more lenient standard"); *see also, e.g., Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 365 (S.D.N.Y. 2013) ("A federal court exercising supplemental jurisdiction over state law claims must apply the substantive law of the state.") (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)).

way," in that the same decisions (not to promote Munjal and not raise his compensation while holding an acting post) are alleged during both periods. *See id.* Finally, in *Cruz v. City of New York*, the court observed that "[t]he various discriminatory and retaliatory acts alleged" before the time-barred date "were committed by different and unrelated actors." No. 21 Civ. 1999 (DLC), 2021 WL 5605139, at *5 (S.D.N.Y. Nov. 30, 2021). As alleged, not so here. The AC alleges that, on each occasion, the same person—Kroemer—denied Munjal the promotion he sought.

Accordingly, the Court denies Emirates' motion to dismiss the AC's pre-July 1, 2018 claims as untimely.

## CONCLUSION

For the foregoing reasons, the Court grants the motion to dismiss the AC's claims under the NYSHRL to the extent they are based on conduct occurring before July 1, 2018, but denies the motion to dismiss such claims under the NYCHRL.

Discovery is to continue pursuant to the civil case management plan, *see* Dkt. 18.

The Clerk of Court is respectfully directed to close the motion pending at docket 6.

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: January 24, 2022
      New York, New York